### JERRALL v. STATE.

#### Opinion delivered February 24, 1913.

1.  ASSAULT WITH INTENT TO KILL—SUFFICIENCY OF EVIDENCE.—Evidence that a shooting was the result of malice; that appellant shot at prosecuting witness four times with a deadly weapon at a distance of twelve or fifteen feet; that prosecuting witness made no hostile demonstration toward appellant, nor contemplated, nor was prepared to do appellant any bodily harm; that appellant fired three shots in rapid succession, and stopped a second or two before firing the fourth, is sufficient to show that appellant assaulted witness with intent to kill him. (Page 93.)

2.  ASSAULT WITH INTENT TO KILL—PROVOCATION.—A quarrel between appellant and the prosecuting witness can not afford justification for an attack on prosecuting witness by appellant the following evening. (Page 93.)

3.  EVIDENCE—RES GESTAE.—Testimony by a witness that he examined pockets of prosecuting witness immediately after the latter was shot, and found no pistol in them, when it appears that there is no collusion, was of the *res gestae* and competent. (Page 93.)

Appeal from Pope Circuit Court; *Hugh Basham,* Judge; affirmed.

##### STATEMENT BY THE COURT.

Appellant was convicted of the crime of assault with intent to kill and appeals to this court. The testimony of Hugh Priestley is as follows: "I am twenty years old; came to Russellville a year and a half ago from Alabama. I lived at the home of Joe Jerrall's father, who kept a

private boarding house. I know Ada Jerrall, the sister of the defendant, but I never made love to her and never made improper advances towards her. On the 13th of October, 1912, defendant shot me four times. This occurred at the home of Mr. Howell on Sunday, about 6:30 or 7 o'clock p. m. It was not good dark when the shooting occurred. I had eaten supper and thought I would walk up to Mr. Howell's and get Monroe Ferguson, a stepson of Mr. Howell, to go with me up town. I walked up to Mr. Howell's and Joe, Mr. Howell and Munroe were all sitting there and I spoke and said good evening, and kinder turned toward them on the edge of the walk and Joe jumped up and began shooting and he did not even speak. I was then boarding about a block from there. I knew Joe was there along that evening. That was not Joe's home and I did not know Joe was there at this particular time; I had seen him there about 5:30, but he had been making his home at the mines. The sidewalk is ten or fifteen feet from Mr. Howell's house. I was walking south when I reached Howell's home and I had got nearly to the north end of the house when I turned and spoke. Joe, Mr. Howell, and Monroe were sitting on the porch. I had started to sit down on the porch by Monroe, I guess. I had no idea that Jarrell was going to shoot or do anything of that kind; I had my hands down at my side. I had a little knife, such as I had been carrying all the time, an ordinary pocket knife. It was in one of my pockets and shut. My hands were not in my pockets that I know of. I did not place my hands upon my hip pocket or anything like that. The defendant shot me with a forty-five automatic pistol. Shots sounded like they were pretty rapid.''

On cross examination, witness stated that it was true that he and Joe had a little trouble down at the mines on the evening before the shooting; that this occurred at Mr. Jerrall's home; that the cause of the trouble was his attention to and talking with Miss Ada Jerrall. He stated that after the hot words with Joe Jerrall, he went to George Davidson's and tried to borrow a gun: the

reason he wanted a gun was that Joe was hunting one for him. He called Davidson out of the house and told him what he wanted. Davidson did not let him have the gun and he (Priestley) got so mad that he cried. He did not tell Henry West that he was going to kill every damn one of the Jerrall family, but he did say that Joe could not run over him. He admitted that Joe Jerrall came in the house while he was there and said nothing to him. He denied that after Joe left, he went by the Jerrall house and told Miss Ada to tell Joe that he would see him later. He did not remember which pocket he had his hand in when he went the next day to Howell's where the shooting took place. He carried his knife most ordinarily in his coat pocket; then it was in his pants pocket; he did not have it open on that occasion. He had passed Howell's home about an hour and a half before the shooting, saw the defendant there and did not speak to him, although others in the buggy did speak to him. He did not think that his going up to Howell's would bring on a difficulty. He was not looking at Joe when he walked up to the house and said "good evening," but he stopped directly in front of Joe. Joe drew the weapon and began firing and it was over as soon as he could work one of these automatic pistols. Not a word was spoken by him or Joe after the shooting commenced. Joe did not tell him the afternoon before when he asked witness to quit talking to his sister; that "We were all good friends and he wanted us to remain so;" he (Joe) did not tell witness that his (Joe's) father and mother objected to his talking to Miss Ada. Joe was running over witness and witness told him that he would fight it out right then and there if Joe wanted to. Miss Jerrall knew that witness had a wife back in Alabama and that this wife had left him. Miss Ada knew that witness' wife did not want to live away from her people and that she had gone home for that reason. Witness lived for a year in the Jerrall home as a member of the household. He had been away from the Jerrall home about a week when the shooting occurred. When witness and Joe had the row the even-

ing before, the witness talked about settling it with him then and there, witness meant a fist fight and he got the pistol merely for the purpose of protecting himself.

Witness, Dr. Wiggs, testified that he got to the prosecuting witness in about three minutes after the shooting occurred. Witness heard the shots, three were fired in rapid succession and then an elapse of a second or two, when the fourth shot was fired.

Witness Nugent testified, over the objection of appellant, that he reached the scene of the shooting within three minutes after it occurred. When he got there, the prosecuting witness was sitting on the edge of the porch; witness helped him into the house and searched his clothes; he did not find any open knife in his right hand coat pocket. Witness went through his pockets because he had curiosity to see if he had a gun; witness did not think there was an open knife on him; it was only a small pocket knife. Witness went all around in all the pockets he could get to. Witness thought if he could find a pistol, he could find who caused the trouble. Witness thought that if he could find a pistol that there had been two shooting. Witness did not find out, until ten minutes after he got there, who did the shooting. There did not seem to be anybody that knew anything about the matter. Here appellant again objected and moved to exclude all that testimony, but his motion was overruled.

Dr. R. L. Smith testified to the character of the wounds. One wound was near the temple; one in the right shoulder, entered from behind and ranged downward and was the most dangerous wound received; one in the left side, a skin and muscle wound; and one wound in thigh which cut the skin for three inches from entrance to exit.

Witnesses on behalf of appellant testified that they saw Priestley on Saturday evening before the shooting occurred on Sunday evening and that Priestley began to cry and said he would kill all the damn Jerralls; "if they thought he was afraid of them, he would show them; that

he would kill every damn one of the damn Jerrall family.''

Witness R. H. Howell, on behalf of appellant, testified he was sitting on his front porch.. Defendant and Monroe Ferguson were sitting there also; Priestley came up the sidewalk until he got about twelve or fourteen feet from the house and when he got even with Joe, he stopped and said "hello." He had his right hand in his back pocket and was looking right at Joe; was facing him. About that time Joe raised up and began shooting. Four shots were fired; Priestley did not fall until the fourth shot. Joe did not fire any shots after Priestley fell. Joe did not try to do anything more. Priestley was taken in witness' house. Witness examined his coat after some one had removed it and hung it on a hall-tree. He found an open knife in the right coat pocket. On cross examination, the witness stated that he thought Priestley's hand was in his right-hand coat pocket when he walked up and said "hello." Another witness corroborated the testimony of the above witness substantially. It was testified that Priestley was not shot from behind.

The testimony of appellant tended to show that he had had trouble with Priestley on the day before the shooting. Priestley was talking to his sister. Appellant warned Priestley that the attention he was showing appellant's sister was distasteful to his father and mother and her father and mother were not at the home at this time. Priestley got mad and said he could not run it over him and that he had a right there; that he was not afraid of me; and that he would settle it right there. He went away on his horse and in a short time he came back by in a lope and told appellant's sister to tell appellant that he (Priestley) would see appellant later. Appellant was told that Priestley was trying to get a gun for him and that he had threatened the whole family. Appellant next saw Priestley on Sunday evening between 4 and 5 o'clock, passing with other parties in a buggy. The other parties spoke to him, but Priestley did not. He next saw Priestley when the shooting

occurred. Priestley walked up until he was directly in front of appellant, then turned and faced appellant and drew his hand back to his hip, and appellant believed from what he had heard that Priestley was going to begin shooting, then appellant began firing.

*Tom D. Brooks* and *J. T. Bullock,* for appellant.

Evidence of witness Nugent was incompetent. Incompetent evidence is prejudicial where there is a conflict in the evidence. 91 Ark. 555.

Where it does not affirmatively appear that the error was harmless the case will be reversed. 69 Ark. 594; 73 Ark. 146.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

Passion alone will not reduce the grade of homicide. 99 Ark. 407-410; 96 Ark. 55.

A general motion to exclude all the testimony of a witness is properly overruled if a part of it is competent. 96 Ark. 55.

WOOD, J., (after stating the facts). The appellant contends that the evidence is not sufficient to sustain the verdict; but giving the evidence, introduced by the State, its strongest probative force, we are of the opinion that it was sufficient to show that the appellant assaulted Priestley with the intent to kill him. No better evidence of that fact could be produced than the testimony showing that at a distance of twelve or fifteen feet, appellant began shooting at Priestley with a deadly weapon and shot him four times. The testimony also was sufficient to show that the shooting was the result of malice. The testimony of Priestley tended to show that he was making no hostile demonstrations towards the appellant at the time appellant began firing on him; that he was not contemplating any injury to the appellant at the time and was not prepared to do him any bodily harm, especially at the distance between him and appellant when appellant began firing. The testimony of one witness tended to show that appellant fired three shots in rapid

succession and then stopped for a second or two before firing the last shot. Priestley received one wound in the back.

The jury accepted and believed this testimony rather than the testimony of appellant himself and his witnesses that tended to show that the shooting was done in self-defense. The testimony on behalf of the State was sufficient to warrant the jury in finding that the shooting of Priestley was caused by the quarrel that appellant and he had on the evening before, concerning the attention that Priestley was giving to appellant's sister, to which appellant objected. According to the testimony of Priestley, there was no provocation for the shooting unless the above was the motive. But this quarrel between appellant and Priestley could not have afforded justification for the attack made by appellant on Priestley on the following evening, nor was it sufficient, if death had resulted from the assault, to have reduced the grade of the offense from murder to manslaughter. *Clardy* v. *State,* 96 Ark. 55; *Young* v. *State,* 99 Ark. 407.

There was no prejudicial error in the court's ruling upon the admission of the testimony to which appellant objected. The testimony that the witness found no pistol in the pockets of Priestley on a search made immediately after he was assaulted, under circumstances which showed that there could have been no collusion, was of the *res gestae* and competent. The judgment is therefore affirmed.